United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRELL EDWARD BUCKINS,<br><br>Plaintiff,<br><br>v.<br><br>BRENDA MCCOY, et al.,<br><br>Defendants. | Case No. 16-cv-06157-SI<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 51 |

**INTRODUCTION**

Darrell Edward Buckins filed this *pro se* civil rights action under 42 U.S.C. § 1983 to complain about his medical care while he was jailed in Oakland, California. This action is now before the court for consideration of the motion for summary judgment filed by defendants. For the reasons discussed below, the motion will be granted, and judgment will be entered in defendants' favor.

**BACKGROUND**

This action concerns the responses of jail medical staff to Buckins' complaints of urinary problems and related pain. Buckins contends that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by their deliberate indifference to his urinary problems and related pain. He also asserts state law claims against defendants.

The following facts are undisputed unless otherwise noted:

A. The Relevant Time Frame and The Parties

The events and omissions giving rise to this action occurred during the time period of December 2014 through August 20, 2015 (the "relevant time"), while Buckins was housed at the Glenn Dyer Detention Facility in Oakland, California (occasionally referred to as "the jail"). Buckins was sent to the Santa Rita County Jail on August 20 for a few days and then was transferred to San Francisco County Jail on or about August 23, 2015.[1] Docket No. 1 at 7.

At the relevant time, Buckins was a convicted prisoner. Docket No. 52 at 6 (Buckins Depo., RT 14).

Defendants Dr. Brenda McCoy, Physician's Assistant Jeffrey Cooper, Dr. Maria Magat, and licensed vocational nurse Debra Walker allegedly were health care providers who provided care to Buckins at the jail. Docket No. 11 at 3-4. Dr. Magat also allegedly supervised Dr. McCoy. *Id.* Defendant Dr. Harold Orr allegedly was the medical director of the jail. *Id.* at 2. Defendant Corizon Health Services, Inc., allegedly was the company that provided medical care for inmates at the jail. *Id.* at 2 Defendant County of Alameda was the municipal entity that ran the Sheriff's Department. *Id.* Defendant Alameda County Sheriff Gregory Ahern allegedly was in charge of the jail. *Id.* at 4.

B. Urinary Tract Infections and Urinalysis Reports

Dr. Magat provides some information about urinary tract infections (UTIs) in her declaration. Docket No. 51-1 (Magat Decl.). "Diagnosing UTIs can be challenging. Clinicians have to, among other things, distinguish UTIs from other diseases that have similar clinical presentations." *Id.* at 12. Clinicians "generally have to rely on a small number of tests to augment [their] clinical impressions. None of these tests individually have adequate specificity and

---

[1] After Buckins was transferred to the San Francisco County Jail, it appears that he was released later in 2015, and then was arrested again and sent back to San Francisco County Jail in October or November 2015. *See* Docket No. 52 at 6 (Buckins Depo., RT 14); *see also* Docket No. 51-4 at 12 (medical note mentioning that Buckins was in a motor vehicle accident on October 31, 2015); Docket No. 51-4 at 25 (medical note mentioning Buckins' November 6, 2015, arrest for, among other things, leaving the scene of an accident and hit-and-run). Buckins currently is housed at the San Francisco County Jail.

sensitivity. Diagnosing UTIs and treating them thus commonly entails educated guesses and judgment calls." *Id.* at 12-13. Due to their anatomy, men are less likely to develop UTIs than women. *Id.* at 11.

The several urinalysis reports in the record use a similar format. *See* Docket No. 51-3 at 13-24. Each urinalysis report lists the patient's results as well as whether those results are "abnormal" in comparison with a stated reference range for certain substances (e.g., specific gravity, protein, nitrites, leukocyte esterase, and white blood count). The urinalysis report itself does not say anything to the effect of "patient does have a UTI" or "patient does not have a UTI." In other words, a lay person cannot look at a urinalysis report and definitively say whether the report's results mean that the patient has a UTI.

Dr. Magat also provides some information about urinalysis results in her declaration. A white blood count (WBC) in the urine of 11-20 is "slightly elevated." *Id.* at 11. An elevated WBC may be caused by a UTI, but an elevated WBC also can exist for "many reasons" other than a UTI. *Id.* An elevated WBC may exist in a healthy patient, and it also may be due to the manner in which a urine specimen has been collected. *Id.* Leukocyte esterase (LE) "detects white blood cells through an enzyme such cells release. LE may be evident due to a variety of reasons, including foreign bodies or nephrolithiasis." *Id.* at 11. Nephrolithiasis is more commonly known as kidney stones. *Id.* at 5. The most common kidney stones "are calcium stones, which are not due to UTIs." *Id.* at 13. Urine can appear cloudy due to an elevated WBC, but cloudy urine also can be normal, or it can be cloudy due to blood, mucus, prostatic fluid, and/or skin cells. Elevated WBC and LE levels "can increase the index of suspicion for a UTI" but there are other factors to consider in determining whether a patient has a UTI. *Id.* at 12. Dr. Magat's declaration indicates that the presence of bacteria (including the amount of bacteria) is a critical marker for a UTI and whether there is a need for antibiotics. *See id.* at 11 ("more importantly, the urinalysis showed no bacteria" and was negative for nitrites "which is relevant because certain bacteria that can cause a UTI produce an enzyme that breaks down urinary nitrates into nitrites"); *id.* at 12 (opining that no UTI existed because, among other things, "the urinalysis also showed that only a few bacteria were present"); *id.* at 12 (clinician would be limited in her ability to select an effective antibiotic because the culture revealed the

3

presence of no bacteria).

According to Dr. Magat, "[p]roviding antibiotics in the absence of a sufficiently high index of suspicion for bacterial infection . . . should be avoided because excessive provision of antibiotics can lead to resistance in the patient and/or in the community." *Id.* at 12.

C. Care For Buckins' Complaints of Urinary Problems and Pain at Glenn Dyer Jail

In November 2014, Buckins complained about heartburn while lying down. Dr. McCoy ordered Prilosec for him.

On December 24, 2014, Dr. McCoy saw Buckins for complaints of abdominal pain. According to Dr. McCoy's notes, Buckins reported that his pain was intermittent throughout the day, worse when lying down, and relieved by sitting up. He further reported that he was drinking a lot of water and urinating a lot. Buckins also reported that he was doing a little better with Tylenol and had stopped taking Prilosec after 2-3 doses because it was not helping him. Dr. McCoy noted that the left-upper-quadrant pain had an "unclear etiology" and possibly was an enlarged spleen. Docket No. 51-3 at 10. Her plan was to obtain lab results, encourage compliance with the Prilosec trial, and renew a Tylenol prescription. *Id.*

During December 2014 and January 2015, Buckins declined to take the Tylenol on 21 occasions. The Tylenol order was changed so that the Tylenol would be dispensed at night rather than in the morning pursuant to Buckins' request on January 22, 2015.

An x-ray done on December 29, 2014, showed stool throughout Buckins' colon and no abnormal masses or calcifications. Docket No. 51-3 at 12. The presence of stool throughout the colon "reasonably could be interpreted as evincing constipation." Docket No. 51-1 at 2.

A urinalysis dated January 14, 2015 (on a urine sample collected on January 12), showed clear yellow urine, no bacteria, a "slightly elevated" WBC (which hematology showed to be within normal limits), trace leukocyte esterase, and no nitrites. Docket No. 51-3 at 22; Docket No. 51-1 at 2-3. Dr. Magat opines that the urinalysis did not reflect a UTI or any obvious need for antibiotics. Docket No. 51-1 at 3.

On January 28, 2015, Buckins submitted a request to see the test results, which had not been shared with him. Dr. McCoy and LVN Walker told Buckins the test results were normal, even though the results were abnormal.[2] Docket No. 1 at 5.

On February 18, 2015, Buckins told Dr. McCoy that he was experiencing an intermittent, diffuse, stabbing sort of pain that involved his entire abdomen but was mostly on the left side. According to Dr. Magat, this pain pattern is "uncommon among patients with UTIs." Docket No. 51-1 at 3. Dr. McCoy noted Buckins' symptoms, examined Buckins, suspected that he had constipation, and ordered milk of magnesia, Colace, and Metamucil for him.

Buckins complained to Dr. McCoy on March 26, 2015, that he was experiencing diffuse abdominal pain that was sometimes sharp and spread everywhere. Dr. McCoy noted Buckins' symptoms, examined him, and concluded that the cause was unknown but possibly was due to constipation. She planned to obtain further abdominal imaging. An x-ray done that day showed no evidence of obstruction and only minimal stool in the colon and rectum. Docket No. 51-3 at 50. After the x-ray was done, Dr. McCoy thought Buckins' complaints might be due to gastritis and planned for him to receive Prilosec and to follow-up at sick call if indicated.

On April 6, 2015, Buckins complained about abdominal pain. A nurse assessed him and scheduled a sick call. Docket No. 51-3 at 36. Dr. McCoy evaluated Buckins on April 15 for ongoing complaints of abdominal pain. She examined him, noted his symptoms, explained available lab data to him, and planned to obtain an ultrasound to further investigate the possibility of an enlarged spleen.

Later that month, Buckins refused to go for the scheduled ultrasound.

Buckins told an LVN on May 8, 2015, that he saw blood in his urine that day, he experienced burning when urinating, his abdominal pain had started to radiate to his back, and the radiating pain increased when he was lying down. *See* Docket No. 1 at 4. A urine dipstick showed urine that was clear with some red blood cells, no leukocytes, no protein, and no nitrites. Buckins' vital signs were

---

[2] Defendants disagree with Buckins' statement that LVN Walker discussed the lab results with him. For purposes of ruling on the motion for summary judgment, the court accepts as true the version offered by the nonmoving party, Buckins.

5

within normal limits, and he appeared in no acute distress. The on-call physician, who had been called by the LVN, ordered Tylenol with codeine and a sick call. The next day, Buckins told a nurse that it hurt when he urinated and that he did not want to drink fluids because it made him urinate too often. Buckins' vital signs were within normal limits. The nurse assessed Buckins as having less than optimal hydration and encouraged Buckins to hydrate and take his medication as ordered. Docket No. 51-3 at 40.

On May 11, 2015, Dr. McCoy noted Buckins' refusal to increase water intake and further noted that his refusal of the ultrasound complicated efforts to find the origins of his complaints of abdominal and back pain. She also noted that he was reporting signs and symptoms of possible urinary stone passage and encouraged him to notify staff of similar symptoms. A urine dipstick done that day showed a small trace of leukocytes, and no nitrites, blood, or protein. Blood and urine samples were sent for lab analysis. The urinalysis showed cloudy yellow urine with moderate leukocyte esterase and elevated WBC and red blood cell (RBC) counts. But the urinalysis showed no nitrites and only a few bacteria, and a culture generated no growth. Hematology showed WBC and RBC within normal limits. Docket No. 51-1 at 5; Docket No. 51-3 at 18, 20, 21, 40. (Dr. McCoy did not work at the jail after May 13, 2015. Docket No. 51-1 at 12.)

An ultrasound done on May 20, 2015, had findings deemed "suspicious for bilateral nephrolithiasis," i.e., kidney calculi or kidney stones. Docket no. 51-3 at 66.[3]

Dr. Sing evaluated Buckins on May 22, 2015, noted his complaints and requested a referral to the Highland Hospital urology clinic. Dr. Magat approved the request that week. Docket No. 51-1 at 5; Docket No. 51-3 at 44. Highland Hospital's urology clinic, which took care of scheduling appointments, did not schedule an appointment for Buckins before he was transferred out of the Alameda County Jail system. *See* Docket No. 51-1 at 6.

---

[3] The report for the May 20, 2015, ultrasound commented that the liver and spleen were normal and that the pancreas was unremarkable. The report further stated: "The kidneys are at the lower limits of normal in size with the right kidney measuring 9 cm and the left kidney 8.5 cm. There is questionable finding of small foci of increased echogenicity in both kidneys which may represent stones." Docket No. 51-3 at 66.

On May 27, 2015, physician's assistant (PA) Jeffrey Cooper evaluated Buckins for his complaints of increasing urinary frequency. PA Cooper noted that the recent urinalysis showed moderate leukocyte esterase, but the culture showed "no growth." Docket No. 51-1 at 5; Docket No. 51-3 at 45. Buckins' vital signs were within normal limits and he was in no acute distress. PA Cooper examined Buckins and noted mild subjective tenderness with percussion of the areas of the back over the kidneys. Although the culture showed no growth, PA Cooper referenced the recent elevated WBC and ordered Bactrim DS (i.e., a combination of two antibiotics used to treat a wide variety of bacterial infections) and continued Motrin twice a day for the reported pain.

Buckins had interactions with health care providers on several occasions in June 2015. Vital signs and a urine dipstick taken on June 5 had findings that were within normal limits. At a visit on June 8, Buckins asked PA Cooper for a pain reliever other than Motrin; PA Cooper ordered Naproxen and assured Buckins that the recent abdominal ultrasound was relatively unremarkable. Cooper ordered a follow-up urinalysis because the course of the Bactrim DS antibiotic had been completed. On June 16, an LVN scheduled Buckins for a clinician evaluation after she learned that Buckins had complained to a deputy about abdominal pain. *See* Docket No. 51-3 at 48. On June 17, Buckins reported to PA Cooper that he had passed a stone a day earlier and complained about ongoing mild bilateral flank pain. Buckins reported difficulty correlating his pain with when he received his naproxen, so PA Cooper replaced the naproxen with 10 days of Tylenol with codeine. *Id.* PA Cooper conferred with the woman who coordinated Highland Hospital appointments to check on the status of the urology consult request and noted, on June 23, that the woman was waiting to hear back from Highland Hospital. ("Per standard practice, Highland set the order of such appointments based on its assessment of degree of urgency." Docket No. 51-1 at 6.) Dr. Sing saw Buckins on June 26 for complaints of ongoing pain; he ordered additional Bactrim and planned to try to expedite the urology consult after noting that the urinalysis following the course of Bactrim showed a trace of leukocyte esterase. Dr. Sing noted that the culture results were not then available; the culture results available later revealed "no growth." Docket No. 51-1 at 6. On June 29, Buckins complained to a nurse that his foot was itchy and painful. Buckins thought he was having a reaction to the antibiotic, wanted to see a doctor right away, and wanted something for his pain. The nurse

7

contacted Dr. Magat, who ordered ibuprofen, continued the antibiotic, and coordinated a sick call for the next day. *Id.*

Dr. Magat evaluated Buckins on June 30, 2015, noted his symptoms and test results, and assessed him as having pyuria (i.e., pus in the urine) likely due to kidney stones with no evidence of renal colic. She doubted that he had any adverse reaction to Bactrim, which he had taken in the past with no adverse effects. She encouraged him to continue to drink plenty of fluids to flush renal stones, continued the ibuprofen, ordered Ciprofloxacin in place of the Bactrim, and planned for a urinalysis following completion of the antibiotic therapy. Docket No. 51-1 at 7.

On July 7, 2015, Dr. Magat again evaluated Buckins, who said he felt fine, denied painful urination or blood in his urine, and said his left lower abdominal pain was better. He was in no apparent distress and his vital signs were stable. Dr. Magat's assessment was that Buckins had kidney stones with no renal colic. She planned for a repeat urinalysis, encouraged him to drink plenty of fluids to facilitate kidney stone passage, and ordered Tylenol for pain. *Id.* at 7.

Dr. Magat evaluated Buckins again on July 23, 2015, at which time Buckins thought he was developing a bladder infection and said he was experiencing back pain that was worse at night. Buckins requested stronger pain medication to take at night. Dr. Magat's assessment was kidney stones with back/flank pain. Dr. Magat ordered Tylenol with codeine at night for 30 days and explained to Buckins that the next step would be a KUB (i.e., a plain abdominal film that provides information about the kidneys, ureters, and bladder). Urinalysis results from a sample collected that day showed trace leukocyte esterase with no nitrates and no bacteria. A culture revealed no growth. PA Cooper reviewed the lab results on July 27 and concluded that no treatment was indicated at that time. *Id.* at 7-8.

On August 5, 2015, Buckins told PA Cooper that he was experiencing urinary hesitancy and thought he had developed a UTI. He wanted Tylenol with codeine in the morning as well as in the evening. PA Cooper said he would have to discuss the issue with Dr. Magat. The urinalysis report for the sample collected the next day revealed elevated WBC and leukocyte esterase, but there were no bacteria and a culture revealed no growth. Believing the lab result to show a UTI, on August 10, PA Cooper ordered another course of Ciprofloxacin and Pyridium for the reported pain. Docket

8

No. 51-3 at 57. Buckins refused the Pyridium on August 11 and 12. *Id.* at 58.

On August 12, 2015, PA Cooper again evaluated Buckins, who was focused on getting Tylenol with codeine twice a day rather than just in the evenings. *Id.* at 59. Buckins had been refusing the regular Tylenol ordered for him in the morning. PA Cooper planned to confer with Dr. Magat about Buckins' desire for more narcotic medication and for a further urinalysis. On August 19, PA Cooper renewed the order for Tylenol with codeine. Docket No. 51-1 at 8.

Buckins left the Glenn Dyer Detention Facility on August 20, 2015, spent a few days at the Santa Rita Jail, and arrived at the San Francisco County Jail on or about August 23, 2015. Docket No. 1 at 7. During his stay at the Glenn Dyer Detention Facility, Buckins had not seen a urologist.

Dr. Magat, who has a medical degree and more than 22 years of experience as a physician and has addressed urinary problems and related pain complaints numerous times, opined that "no breach of the standard of care occurred and that no purported breach caused harm." Docket No. 51-1 at 16. She also opined that Buckins' alleged injuries were not due to deficient care and instead were most likely due to kidney stones, benign prostate enlargement, and/or musculoskeletal issues. *Id.*

D. Buckins' Care At San Francisco County Jail

A medical screening form prepared at the San Francisco County Jail on August 24, 2015, noted that Buckins had complained of kidney stones and a UTI at the Alameda County jail, and "take[s] Tyco#3 for dental pain and Kidney stone pain?" Docket No. 51-4 at 9; *see also id.* at 10 ("encounter report" stating that Buckins had a "hx of kidney stones, inmate claims he has continues (sic) uti, and was [due] to see a specialist. He continues to c/o pain and burning during urination."). The screening form indicated that Buckins would be provided Tylenol #3 for at least several days. *See id.* at 9 ("Acetamin/cod 300 mg/30 mg po tab x1 TAB QHS 08/24/15 – 08/30/15").

At the San Francisco County Jail, Buckins continued to complain about the same sorts of urinary and pain problems. An abdominal CT done on October 31, 2015, showed normal kidneys. Numerous urine cultures were negative or showed an insignificant quantity of bacteria. By December, one of his treating physicians noted that he "doubt[ed Buckins had] any renal problem."

9

1 Docket No. 51-4 at 12. Consultants at the San Francisco General Hospital urology clinic wondered if Buckins' symptoms were due to irritable/overactive bladder and recommended a trial of oxybutynin. *See id.* at 16-17. A physician at San Francisco Jail Health Services concluded that Buckins was not having problems with repeated UTIs and that he did not really have any renal abnormalities. *Id.* at 17. Buckins continued to obtain attention for his urinary and pain complaints over the next several months while at the San Francisco County Jail.

A San Francisco General Hospital urology consultant noted on September 30, 2016, that: (a) Buckins had six negative urine cultures prior to his initial visit in January 2016, ruling out infection as a cause for his reported lower urinary tract symptoms; (b) Buckins' reported problems did not seem to correlate with the times of kidney stone passage, and (c) his assessment was that Buckins' lower urinary tract symptoms were due to commonplace benign prostate enlargement. *See* Docket No. 51-5 at 9.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the complaint occurred in Alameda County, located in the Northern District. See 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald,* 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Buckins' complaint was signed "under penalty of perjury" and the facts therein are considered as evidence for purposes of deciding the motion. His amended complaint is not considered as evidence because it was not signed, let alone signed under penalty of perjury.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id*. at 631.

**DISCUSSION**

A. <u>Buckins' Failure To File An Opposition</u>

Defendants filed their motion for summary judgment on August 31, 2018. The court waited many months for Buckins' opposition to the motion for summary judgment, but the opposition never arrived. The original deadline for Buckins to file his opposition was September 28, 2018; the deadline was later extended to November 2, 2018; and then to December 14, 2018. Docket Nos.

50, 55, 60. When the court extended the deadline to December 14, 2018, it cautioned: "This deadline will not be further extended. By the time the deadline arrives, plaintiff will have had fifteen weeks to prepare his opposition." Docket No. 60 at 1.

Instead of filing an opposition to the motion for summary judgment, Buckins sent yet another letter complaining about the damage to his paperwork that had occurred at San Francisco County Jail as a result of a sewage flood at that jail. Docket No. 61. In that letter dated November 30, 2018, Buckins stated that "it would take [him] a year to gather up materials and resources to oppose the summary judgement" and asked the court to investigate the problem and grant him time to receive a response to a claim he had filed in the claims department at the county jail. Docket No. 61.

The court will not further extend the deadline for Buckins to file an opposition. First, the court already cautioned him in the November 15, 2018 order (Docket No. 60) that the deadline would not be extended beyond December 14, 2018. Second, Buckins indicates that his materials have been destroyed and that he needs another year to prepare his opposition. Waiting another year would result in an unreasonable delay in the resolution of this case. Defendants, as well as plaintiff, have an interest in having matters adjudicated in a timely manner and they will be deprived of such a timely resolution if the motion filed in August 2018 lingers on the docket for another year. Third, the flood that allegedly destroyed his materials occurred in July (a month before he even received defendants' motion for summary judgment); that long-ago destruction of those materials no longer provides cause to extend the deadline for his opposition. With reasonable diligence, Buckins could have prepared his opposition in the many months that have passed since the flood. Buckins also states that he has been moved several times and that law library access is limited, but those sorts of moves are the routine inconveniences that prisoners experience and that the court already has taken into account in setting the generous briefing schedules that occur when one of the litigants is an unrepresented prisoner. Lastly, there is no reason to delay this matter until Buckins receives a response to a claim he has filed with the San Francisco Claims Division in November about the lost paperwork because the response to his claim cannot undo the alleged loss of his paperwork during a flood that occurred six months ago. Moreover, his plan to hire a lawyer with the money he thinks he might obtain from San Francisco as a result of the claim for the lost paperwork is speculative at

12

best.

Buckins' letter (Docket No. 61) also does not warrant relief under Federal Rule of Civil Procedure 56(d), which allows for relief when a party against whom summary judgment is sought "cannot present facts essential to justify its opposition." "The burden is on the party seeking a Rule 56(d) continuance 'to proffer sufficient facts to show that the sought evidence exists, and that it would prevent summary judgment.'" *Atay v. County of Maui*, 842 F.3d 688, 698 (9th Cir. 2016). Buckins makes no showing that any particular evidence exists or, if it does, that it would allow him to withstand summary judgment. His generalized statements that he lost his paperwork and research are insufficient to show that granting him more time would result in him being able to successfully oppose the summary judgment motion.

The court will consider the filings from Buckins that are signed under penalty of perjury, i.e., his original complaint and his November 30, 2018, letter to the court, in analyzing the merits of defendants' motion for summary judgment.

B.     Eighth Amendment Claim

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) that the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

To satisfy the objective prong, there must be a deprivation of a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury" or the "'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). The evidence in the record suffices to allow a jury to conclude that Buckins' urinary problems and pain presented a serious medical need. This is not a determination

13

that a reasonable jury could conclude that he actually had UTIs throughout the relevant period, but only that a reasonable jury could conclude that a serious medical need existed based on the combination of the various urinary problems of which he complained, i.e., painful urination, frequent urination, blood in urine, and passage of kidney stones.

For the subjective prong, there must be deliberate indifference. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*). There must be "harm caused by the indifference," although the harm does not need to be substantial. *See Jett*, 439 F.3d at 1096.

A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (summary judgment for defendants was properly granted because plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to proper course of care where prison medical staff treated his recurring abscesses with medicines and hot packs). "[T]o prevail on a claim involving choices between alternative courses of treatment, [an inmate] must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the inmate's] health.'" *Toguchi*, 391 F.3d at 1058. *Compare Toguchi*, 391 F.3d at 1058 (summary judgment properly granted for defendant where the plaintiff challenged the defendant-doctor's choice to discontinue a particular medication but did not present expert testimony showing

14

that the discontinuation of the medication was medically unacceptable, and the defendant-doctor had submitted expert testimony that her actions met the standard of care) *with Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (error to grant summary judgment based on the difference-of-opinion rule because a reasonable jury could conclude that the decision of the non-treating, non-specialist physicians to deny the recommendations for surgery was medically unacceptable where "the consistent recommendation by two outside specialists over the course of three years" was that the prisoner needed double hip-replacement surgery to alleviate his severe pain and mobility issues).

1. Health Care Providers

Having carefully reviewed the evidence, the court concludes that no reasonable jury could find that the defendant health care providers' responses to Buckins' complaints of urinary problems and pain amounted to deliberate indifference. The undisputed evidence shows that, during the relevant time period lasting about eight months, Buckins was seen on at least twenty occasions by health care providers for his complaints of urinary problems and pain. The undisputed evidence also shows that many diagnostic tests were done at the request of those health care providers: six urinalysis tests, three urine chem dipstick tests, an abdominal ultrasound, and two abdominal x-rays. The undisputed evidence also shows that those health care providers prescribed various medications to Buckins during the relevant time period. Tylenol, Tylenol with codeine, Pyridium, and naproxen were prescribed in response to his complaints of pain, and different pain medications were tried when he complained about inadequate relief. Dr. McCoy also prescribed other medications to address pain complaints that she thought were caused by gastritis and constipation. And the undisputed evidence shows that medical care providers prescribed several courses of antibiotics when they thought some urinalysis results indicated UTIs, even though there was some conflicting information on the urinalysis reports: PA Cooper ordered Bactrim on May 27, 2015, even though a recent culture showed no growth of bacteria, and Dr. Sing ordered additional Bactrim on June 26, 2015, even though the culture later showed no growth of bacteria. Dr. Magat replaced Bactrim with another antibiotic, Ciprofloxacin, on June 30, 2015, when Buckins thought he may have had an

15

adverse reaction to the Bactrim. PA Cooper ordered another course of Ciprofloxacin on August 10, 2015.

The only medical expert, Dr. Magat, gave her opinion that there was no breach of the standard of care and no harm from any purported breach in the response to Buckins' complaints of urinary problems and pain. That medical expert, who also treated Buckins at one point, opined that Buckins' complaints and alleged injuries were most likely due to kidney stones, benign prostate enlargement, and/or musculoskeletal issues. That opinion is consistent with the impression of the urologist who eventually saw Buckins and determined that Buckins' problem was a benign enlarged prostate.

Although there is ample evidence that Buckins repeatedly complained about urinary problems and pain that he thought reflected a UTI, the undisputed evidence also shows that jail medical providers repeatedly examined him and provided care for those urinary problems and pain. Viewing the evidence and inferences therefrom in the light most favorable to Buckins, no reasonable trier of fact could find that defendants' responses to his complaints of urinary problems and pain were "'medically unacceptable under the circumstances'" and done "'in conscious disregard of an excessive risk to [Buckins'] health.'" *Toguchi*, 391 F.3d at 1058.

The court considers whether any of Buckins' allegations and statements warrant rejection of defendants' motion for summary judgment and concludes that they do not. First, Buckins alleges that the urinalysis report dated January 14, 2015, put Dr. McCoy and Corizon on notice that he suffered from a serious medical need if his condition was left untreated. Docket No. 1-1 at 1. He further alleges that the failure to treat his UTI at that time "allowed it to increase and spread." *Id.* In his view, the untreated UTI caused frequent urination, which in turn caused him to become dehydrated, which in turn caused him to develop kidney stones. *Id.* He also is of the view that the medical care he received from providers at Corizon caused his kidneys to be at the lower limits of normal in size and to burn every day. *Id.* He fails to show a triable issue of fact in support of this claim because he provides no evidence that would allow a reasonable trier of fact to conclude that he actually had a UTI in January 2015. Buckins has no medical training and fails to provide any evidence that he is competent to interpret the results of a urinalysis. Similarly, he provides no

16

evidence in support of his theory that an inadequately addressed UTI caused dehydration, kidney stones, or kidneys that are on the lower end of normal in size.

Second, Buckins states in his verified complaint that Dr. McCoy and LVN Walker incorrectly told him that the January 14, 2015, urinalysis results were normal when in fact some of the results were listed as abnormal. Docket No. 1 at 5. Accepting this evidence as true does not save Buckins from summary judgment because he does not show that such statements caused him any harm. To be actionable, there must be harm caused by the indifference. *See Jett*, 439 F.3d at 1096; *see also Conn v. City of Reno*, 591 F.3d 1081, 1098-1102 (9th Cir. 2010), *reinstated as modified by* 658 F.3d 897 (9th Cir. 2011) (discussing actual and proximate causation in the deliberate indifference context). There simply is no evidence that, had Dr. McCoy or LVN Walker told him that his results were abnormal, his course of care would have been any different. Defendants have presented undisputed evidence that the urinalysis – which had "abnormal" results of a "trace" amount of leukocyte esterase and a WBC reading of "11-20 HI," Docket No. 51-3 at 23 -- did not reflect a UTI or any obvious need for antibiotics.

Third, Buckins alleges that Corizon's failure to provide unspecified medical information to the San Francisco County Jail upon his transfer "caused a delay in starting [his] recovery and [is] the source of [his] ongoing pains." Docket No. 1 at 7. This contention does not help him because he fails to describe the information that should have been provided or explain how that lack of the information made any difference to his medical care at San Francisco County Jail. The medical screening form from the San Francisco County Jail on the date of Buckins' arrival plainly shows that officials at that facility knew of his reported history of UTI and kidney stones, his current complaints of pain and burning during urination, the need to schedule him to see a specialist, and that he was on Tylenol #3 (i.e., Tylenol with codeine). The screening form indicated that Buckins would be provided Tylenol #3 at least through the end of the month. Buckins urges that San Francisco County Jail officials were informed that the Tylenol #3 was for a tooth abscess rather than urinary problems. But the screening form states that the medication was taken "for dental pain and Kidney stone pain?" Docket No. 51-4 at 9. In any event, Buckins doesn't show that the purported error caused any harm to him; regardless of whether the Tylenol #3 was thought to have been

17

prescribed for dental pain or kidney stone pain or both, the medication was continued at the San Francisco County Jail. On this evidence, no reasonable juror could conclude that an Eighth Amendment violation occurred when Buckins was sent to San Francisco County Jail without some unspecified medical information.

Fourth, Buckins alleges that PA Cooper discovered that some of Dr. McCoy's notes were erased from the file. Docket No. 11 at 9. Even if PA Cooper told Buckins that he (Cooper) discovered that notes had been erased, Buckins has presented no evidence as to what those notes were or why their erasure mattered to his medical care. Buckins acknowledges that, when Cooper made the discovery, Cooper also saw the recent May 14, 2015, urinalysis results and ordered Bactrim that day. *Id.* In short, even if some notes had been erased, no reasonable jury could conclude that the erasure caused any harm to Buckins.

A medical care provider is not required to be a guarantor of a patient's good health, regardless of whether the patient is in prison or at liberty. What the medical care provider cannot do is be deliberately indifferent to an inmate's serious medical needs. Viewing the evidence and inferences therefrom in the light most favorable to Buckins, no reasonable jury could conclude that defendants actually knew of, and disregarded, a substantial risk of serious harm existed when they responded to Buckins' complaints of urinary problems and pain. The individual health care providers therefore are entitled to judgment as a matter of law on the Eighth Amendment claim.

2. *Monell* Claim

Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort, *see Monell v. Dep't of Social Servs*., 436 U.S. 658, 690 (1978); however, a city or county may not be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior, *see Board of Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). To impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: (1) that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate

18

indifference to the plaintiff's constitutional rights; and (4) that the policy is the moving force behind the constitutional violation. *See Plumeau v. School Dist. #40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

In the order of service, the court determined that the amended complaint, liberally construed, stated a § 1983 claim against Corizon Health Services, Inc., the County of Alameda, and Alameda County Sheriff Gregory Ahern "on a *Monell* theory of liability based on the policies, practices, and customs regarding medical care of inmates described in the amended complaint." Docket No. 12 at 6. The question today is whether there is any evidence that would allow a jury to find such liability.

The *Monell* claim fails as a matter of law because Buckins presents absolutely no evidence in support of his allegations. As discussed above, Buckins fails to present evidence that would allow a reasonable trier of fact to conclude that his Eighth Amendment rights were violated by any medical care providers' responses to his complaints of urinary problems and pain. *See Lowry v. City of San Diego*, 858 F.3d 1248, 1260 (9th 2017) ("Because we conclude that Lowry did not suffer a constitutional injury, she cannot establish [*Monell*] liability on the part of the City."). Buckins also presents no evidence that there was any particular policy, practice or custom regarding medical care of inmates, let alone one that evinced deliberate indifference to his constitutional rights or was the moving force behind the alleged violation. Given the dearth of evidence on every element of the *Monell* claim, Corizon, the County of Alameda, and Sheriff Ahern are entitled to judgment as a matter of law on the claim.

C.   The State Law Claims

The court has concluded that defendants are entitled to judgment as a matter of law on the § 1983 claims. Only state law claims remain. With the termination of the claims that gave the court federal question jurisdiction, the court declines to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3). This action will be dismissed without prejudice to Buckins filing a new action in state court to pursue his state law claims. Buckins should act swiftly to file an action in state court, if he wishes to pursue his state law claims, to avoid any potential statute of limitations issues.

## CONCLUSION

Defendants' motion for summary judgment on the claims under 42 U.S.C. § 1983 is GRANTED. Docket No. 51. Having determined that defendants are entitled to judgment as a matter of law on the claims that gave the court federal question jurisdiction, the Court declines to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3).

Judgment will be entered on the merits of plaintiff's claims under 42 U.S.C. § 1983 and dismissing the state law claims without prejudice to plaintiff filing a new action in state court to assert his state law claims. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: February 6, 2019

SUSAN ILLSTON
United States District Judge